Mr. Cooper, we'll hear from you. Representative Hewlett. Thank you, Your Honor. May it please the Court. To date, no published architectural copyright case has upheld an award of 0% allocation of profits where there was evidence of some factors like there was in this case. The undisputed evidence in this case demonstrated that there were numerous factors other than the plans which led to the profitability of the defendant. The issue in this appeal, we believe, is whether or not the trial judge erred in failing to require apportionment as every other circuit in this country has required. What evidence did you put on to support an apportionment? Your Honor, there was, we believe, a plethora of evidence. For example, testimony from Wayne Bobb. He testified about the market he was in, that is, custom homes generally in the range of $500 to $1 million. He testified that design is just the first baby step in getting a custom home built and sold. Page 2778 of the record. He said it takes plans in creating them into a home that people can live in, and it requires a ton of work, a lot of monitoring, page 2735. He listed all the factors that contribute to the profitability. High-quality tradespersons, good communication with the trades, use of high-quality interior finishes that look good but are cost-effective, use of professional decorators, access to the world marketplace for purchasing building materials. Importantly, handling of the accounting and financing, getting the construction loan and financing in order to build the homes in the first place, reporting to lenders about the progress. He went ahead also and testified other issues that influenced buyers. He testified that in addition to the design of the home, there's the school district, the quality of the home, the level and quality of the interior finishes, particularly for houses in this price range, attention to detail, longevity of the builder, that is, he's not going to be out of business next year, safety of the neighborhood, amenities, and subdivision. Mr. Bob testified there are a lot of processes that go on after the plan work is finished just to get the house built and to make a profit, page 2782 of the record. Now, Mr. Hewlett also agreed with what was stated by Mr. Bob. He said that bidding for a home within the client's budget goes into the profitability. Making sure a home, quote, comes in within the budget is important, page 2535. The purchase of building materials at a reasonable price, page 2536 to 2737, Hewlett conceded there were other factors besides the design, such as amenities, the neighborhood, proximity to health care, proximity to downtown, good schools, good pricing, reputation of the builder, home location, quality of workmanship, all these are page 2551. He agreed that homes in this price point, again, $500 to $1 million, that the homeowners like nicer finishes and amenities, such as pools. Many of these houses had pools, of course, which had nothing to do with the plans. Neither did the landscaping, the exterior lighting. None of these had anything to do with his drawings. Moreover, in this case, it was conceded that the plans that were used to build the houses by Frontier, there were other things that were not even part of Mr. Hewlett's plans. If you look at the exhibits that went in at trial, he was claiming infringement generally on the center part of the house. There were parts of the house that he agreed were not part of his plans. For example, the Frontier homes had different rooms, additional rooms, that were not contained in the Hewlett plans. Mr. Hewlett conceded that Frontier did not copy his bedroom designs, his bathroom designs, his master bedroom sitting room. Mr. Bob identified many differences in the design, such as the elevations, the first floor he identified, numerous differences, and he also identified numerous differences on the second floor. Now, you look at what other courts have done, and I think it's very telling, particularly in connection with architectural copyright cases, because they are a little bit different from your other types of copyright cases. We know that architectural copyright, it's a compilation. Basically, it's how you arrange rooms, and courts, several courts have held in a two-story house, there's only so many ways that you can arrange rooms. There's a finite possibility. One that I think is very close to this case is the John Danielson v. Winchester Conant Properties case out of the First Circuit in 2003. It was an architectural copyright case. The architect was suing the developer. The developer, he alleged, infringed on his plans. You know, the question to me, I mean, is that whether you presented evidence to the juror that would support the argument that you're making. And I think that's an excellent question, Your Honor, and I think the Danielson case gives us the answer. In the Danielson case, again, they alleged that there was infringement, and the evidence that was presented there, they said there were several contributing factors that helped the condominium project turn a profit, such as they had to do additional drawings, which they did here, coordinate the logistics, that was testified here, supervise subcontractors, Mr. Bob testified to that. Well, I know, but all of this was already, I mean, that was figured into the costs. Well, no, it's making a profit. You're exactly right. I mean, that's already figured into, as I understand, that's figured into the ultimate net profit that you have. I mean, the evidence that you're talking about, these abstract sort of things more or less, you didn't put anything on that wouldn't be? Not exactly abstract, Your Honor, because, again, we could take his design and could build a home, and depending, if we don't control cost, if we don't have financing, we're not going to get the house off the ground at all. If we don't control cost, we're not going to have any profit at all. What does that got to do with the question I asked you? Because the question is what other factors contributed to the profit that was derived from the sale. So what evidence did you put on that were, in fact, these items that contributed to the profit or to diminish the profit? Well, again, as we said earlier. How many houses were involved, 18? Actually, initially they started out with 37. There were 19 that made profits, 18 that lost money. Now, you would think if it was just the design, as counsel contends, that all would have made money. But my problem is that you're making these arguments to us, and you didn't make those arguments to the jury or to the district court. We did make these arguments, Your Honor. You may have made the argument, but what kind of evidence did you put on that? We had the exact same evidence. Did you have experts? We did not. There was no expert testimony in Danielson. In fact, there were cases out there that say— I'm talking about this case right here. I'm talking about this case and this jury and whether it was supported, whether the verdict is supported by the evidence that it had before it. The same quality of evidence that we presented was presented in the Danielson case. The First Circuit said this evidence, and the jury answered zero in that case. Well, I mean, that's Boston. I don't know what happens in the Boston housing market and how they treat things up there. But I'm talking about just plain, ordinary common sense, and that is you've got to put evidence before a jury if you are going to rely on a lack of evidence or undead evidence to set aside the jury verdict. Well, both witnesses—there were two witnesses who testified, Mr. Boff and Mr. Hewlett. Both testified there were other factors that contributed to a buyer's decision to buy the home and the profitability other than the design. Excuse me, but what did you argue to the jury about the allocation? I believe the— Did you tell them to discount it by 50 percent, discount it by— Or I think we argued 10 percent because there was a case that came up here last year, the day before last, the Hallmark case, where the jury allocated 10 percent. The Pinhollow case that was before this circuit in 2007, there was an allocation of 1 percent. 1 percent attributable to the infringing— To the design, to the infringing design. Hallmark case, it was 10 percent, in my recollection. In closing argument, we talked about all the factors and suggested it ought to be 10 percent in this particular case. What's the problem with the jury reviewing all the evidence, determining who it believes, who it doesn't believe, where there's a lack of evidence, where there's sufficient evidence, and deciding what part of the profits came from infringing, what came from non-infringing factors, and you came out on the short end of the stick? That was a jury decision. I think in most cases, Your Honor, you would be exactly correct. But I think when we're dealing with copyright, the law has developed differently. The Supreme Court of the United States has said when there is evidence of other factors, then there must be an allocation. But the Supreme Court said—are you telling me the Supreme Court said that those other factors that you're alleging have to be accepted by the jury? Well, if it's the only undisputed evidence, what is the jury going to base their decision on when the plaintiff and the defendant both say there are other factors? Well, but even if something is undisputed, why can't the jury reject something that's undisputed? Well, we had an expert. Well, I guess then the question is if the jury rejects the only evidence, what does the jury base its decision on if there is no evidence that the court would meet it? How would you say the jury can base its decision on evidence that was not introduced? That's all I'm saying. Well, we're saying the evidence was produced. Mr. Bopp was designated as an expert witness in this case and qualified. I mean, that certainly seems reasonable. But I suppose if the jury had ordered—they obviously awarded 100 percent of the $1.3 million. They could have awarded 75 percent of the $1.3 million. They could have ordered 50 percent, and your client is lowballing it or someone's lowballing it down to 10 percent of the $1.3 million. And I don't—I'd just say lowballing comparatively. I don't know what the—but the problem probably is that the jury didn't find Mr. Bopp credible on other aspects of his testimony, and therefore they weren't inclined to find him very credible on this. Let's assume that the court is correct. Mr. Hewlett said there were other factors as well. Well, I understand. So they would have had to find—he was not credible as well. Sort of like—it's sort of like being in the position of BP right now. Well, I'm glad I'm not. You're damned if you do and damned if you do. Well, but you look—with respect, Your Honor, there have been a number of courts, including this one. In the Pinhollow case, the total sum evidence of other factors was we had to make other changes to the design, and it required a lot of other work. The magistrate—it was not a jury—the magistrate awarded 1 percent in that case of the profits to the infringing work. This court, based on that evidence alone, said that this court held the infringement—the evidence was sufficient to show some apportionment was required. Now, what the court did—I want to be up front with the court—the court sent it back to Magistrate Stickney in Dallas and said, We want you to explain how you came up with the 1 percent in that case. But this court nonetheless said, based on that small amount of evidence, that some apportionment was acquired. In the Danielson case, the court said some apportionment is required. In the Data General case, which was not an architectural case. It was a software copyright case. There was evidence, and the court said—and the jury answered zero. And if it's true that the jury's free to believe who they want to and disregard, then in Danielson, in the Data General case, all these other cases where they reversed and said some infringement is required, why couldn't they have said, Well, the jury just decided not to believe anybody. You lose. There would have been no reason to remand those cases back for a new trial if the jury was simply free to believe who they wanted to believe. Because the Grumman case—Data General v. Grumman—they listed all the factors why the customers chose their product in addition to the infringing software. Again, Judge Jolly, again, I'm not trying to belittle your argument. If that was true, then all these cases, they wouldn't have had to reverse and send them back because the easy way—not the easy way. One way out would have been to say the jury simply chose not to believe anything that you said. And they didn't. They said, based on the evidence, there was some factors presented. The jury was required, and they used this term as a matter of law, to make some apportionment. And we believe that is what the law is with respect to copyright. There was an instruction. There was an instruction. They held it was incorrect. But, again, if there was no evidence of apportionment—I'm sorry—there would have been no reason to support the instruction. But the best you can hope for is a new trial, right? Only apportionment issue, the best we hope for, only access, only strikingly similar. It would be a rendition point, but on the apportionment, it would have to go back to new trial, just like Data General Grumman. Mr. Cooper, you have saved some time for rebuttal. Thank you, Your Honor. Yes, sir. Thank you. Mr. Bonham, we'll hear from you now. Good morning. May it please the Court. My name is Louis Bonham, and I represent Hewlett Custom Home Design. I'm going to talk first about the issue of profits because that's what the Court has zeroed in on. This is a very, very straightforward case. 504B makes it very simple. The only burden on the copyright owner is to prove gross receipts. That's it. We prove gross receipts. At that point, all of the gross receipts are presumed to be profits attributable to the infringement. Is gross receipts always defined in terms of the value of the end product, which is the house, as opposed to the value of the plans? In the architectural copyright cases, yes, Your Honor, it is. Okay. There's a presumption under the law for gross receipts, is what you're saying? Yes, Your Honor. This is the MGE case. It was also, if you look, there's a Fourth Circuit case on this, which is— They don't really challenge that. They do not. Gross receipts were stipulated in this case. That's what I'm saying. This is a very simple case because gross receipts were stipulated to in the joint pretrial statement. The expenses were stipulated to at trial. We save the jury having to go through all the receipts and everything. So the only question was can the defendants prove and persuade the jury that there were other factors that caused the profits? If the jury doesn't buy their argument, and you touch it with a needle, Judge Afric, in that as in any case, the jury can choose, even if there is undisputed testimony on damages, the jury can say we don't find it credible. And the Fifth Circuit has found that in the Corpus Christi oil and gas versus apodic case. But let's just look at what is in the evidence because that's where I think Judge Werlein's opinion explains this perfectly. What evidence was in the record was they asked Mr. Hewlett in general, in general, why do people buy houses? Do they buy it for this reason? Well, yes. Can they buy it for this reason? Well, yes. And that was the same kind of testimony that Mr. Bopp gave. In general, why do people buy houses? What they did not do is put on a shred of evidence for why any of the particular houses in this case sold. So, for example, if you look at the house that is at 15510 Wimberly Way, which is the second item in the jury's charge, what evidence is there of what school district it was in? There's none. Was there a pool in that house? There's no evidence of that. Is there evidence of any special amenities on that house? There's none. Now, you may ask, why is it that the defendants didn't put on any evidence on the specific houses? And as we point out in our brief, there's a reason. In discovery, did they disclose any witnesses or any documents that would have supported any 504B other factors? No, they did not. We asked them very specifically in an interrogatory to disclose all of your 504B expenses, deductions, allocations, and the evidence supporting it. Did they disclose any 504B other factors? No, they did not. And the most telling one is when I took Mr. Bopp's 30B6 deposition and I went through house by house by house. Who bought this house? Answer, I don't know. Why did they buy this house? I don't know, et cetera, et cetera, et cetera. So at time of trial, we moved in limine and said they can't contradict the 30B6 testimony on this. They agreed to the motion in limine. So they weren't going to be able to put on the kind of specific evidence that you might see in some other cases. Instead, they're just simply asking the court – excuse me, asking the jury, and you can look in the transcript of the final argument. They didn't point to evidence. They said you can use your common sense. Well, common sense is not evidence, especially not on a point where they have the burden of proving it. One of the problems with common sense is that it is common. I mean I didn't try to give you something to think about. I understand, Your Honor. The other aspect, and this is something that was contained in the charge, and it's something that the appellants have pretty much overlooked or ignored in their brief, and this goes back to the issue of intertwinedness. And the Supreme Court has held on this going back to the Callahan v. Myers case in the 1880s and has also said it in the Sheldon case and most recently in the Harper and Rowe case. And that is when you combine infringing and non-infringing factors, and you've got them all balled up in one particular work, it is your burden as the infringer to unentwine them and to separate out. What happens if you don't put on evidence showing how you can tease out all these factors? What the Supreme Court said in Callahan is the infringer must then abide the consequences. And if that results in a harsh result, to quote the Supreme Court, he has only himself to blame. In this case, was there any evidence to show the jury how much of these factors were due to anything else? No. Was there any evidence to show how they could be separated out? There wasn't. And for that reason, if you look at the instruction that Judge Werlein gave, if they don't carry the burden of showing that they can be unentwined, and this was not objected to, then you must write zero. And that's what the jury did. The bottom line on the damages, I believe, is that it's their burden. If they don't step up to the plate and put on the kinds of evidence that you typically see in an architectural copyright case, then the jury has to do what they did and say you didn't meet your burden of proof. Now, I will comment on a couple of things. Mr. Cooper indicated that the Danielson case was an architectural case. It actually is not. Danielson is a pre-AWCPA case. AWCPA Architecture Works Copyright Protection Act of 1990. Danielson involved infringement of blueprints, not architectural works. So in that case, the profits from the development were indirect profits, and so you would have to have something different there anyway. Here we're talking about the profits from the sale of an infringing copy because under the AWCPA, an architectural work is defined as the design of the building as embodied in any tangible media of expression, including the building. So therefore, the house that is constructed from the infringing design is considered to be a copy, and that's why the sale of the copy, that's why that amount goes in as gross receipts. And you can look at Powell v. Penhall and lots of other cases, which we cited in the briefs, which talk about the way you do these in these cases is you start with either the value of the house or building or the sale price of it, and you go from there. I will touch briefly on the access issues. I think as we pointed out, there are three areas of evidence that support the finding of access. Access under Fifth Circuit law is simply that there was a reasonable opportunity to view the work. It does not require us to, if you will, prove and put a copy of the work in the defendant's hands, just merely that they had a reasonable opportunity to view the work. Or as in the Ferguson case, the court actually phrased it as a reasonable possibility of access. And in the Peel case, the court held that whether the possibility of access was reasonable is a question for the jury. And juries pass on whether something is reasonable all the time. Was the injury reasonably foreseeable? Was the use of deadly force in a self-defense situation reasonable under the circumstances? This is a classic jury issue. But if you look at the particular ones, the Cotus Clay House Plan 4210, this was built and marketed literally across the road from where Frontier was operating at the time. You had testimony. We had to do it by impeachment. But Mr. Bopp admitted in another copyright case that, yes, during that period of time, he did go and look at competitors' houses. So was it— There's no evidence that he was blind. We have no evidence that he was blind. I think the jury could have inferred that he wasn't by the way he walked up to the stand. But, again, the point is he had a reasonable opportunity to have seen the house. That's all that the law requires. Now, could the jury have said we don't think that's enough? Absolutely. But that's a jury question. The Woodland Showcase House, same thing. This was something that was built, that was open to the public, that you had, according to Mr. Bopp, thousands of people going through it, including area builders. He's building in the woodlands. This is being done in the woodlands. The idea—and, of course, I believe the evidence showed that he admitted that he'd been to Woodland Showcases in the past. Now, he did deny going to this particular one, but the jury could disregard that. So did he have a reasonable opportunity to have seen the Woodland Showcase House? Yes. That's enough evidence. That gets us over the line. The third point is the issue of striking similarity, and on this one I'll touch. First, they've relied on a case out of the Eleventh Circuit known as the InterVest case, saying that architectural works are a collection. Well, as I've gone through in great detail in the brief, the InterVest case has been trashed nationwide. Most recently, and this is—excuse me? Which case has been? InterVest. InterVest. It is an Eleventh Circuit case which holds that architectural works have a thin copyright because all they are is a collection. All right? Most recently, the Second Circuit— You're talking about trashed from the Atlantic to the Pacific, isn't it? Yes, sir. Nationwide. Yes, nationwide. Most recently— Is it for a judge that wrote that? It was Judge Birch from the Eleventh Circuit. You're getting personal now. Excuse me? You're getting personal. You're naming names. I've studied it a little bit. Most recently, the Second Circuit in the Zalewski v. Cicero Builders case. That's not in my brief because it's a fairly recent case. And that's citation. Citation on Zalewski is 754 F. 3rd, 95, Second Circuit, 2014. They looked—they were asked to follow InterVest. They refused to do so, and their reasons for not doing so are pretty much the same arguments as we've set forth in the brief. It ignores the legislative history. It would treat any copyright work as a compilation, for example, music, because by the same logic of InterVest, music is just a collection of unprotected notes. That's not the law. Again, I don't think you have to reach the InterVest issue in this case, but if you have any thoughts that you're going to, I would suggest that you want to read Zalewski. No, we found Judge Warline's order on new trial very helpful, and you didn't seem to really mention it a lot in your brief. I think he hit the right notes. I would have—I think it would have been good enough for supplemental record excerpts on your part. I believe it's actually in the record excerpts of the appellant. Not his order on new trial, I don't think. Yes, Your Honor, it is. Is it? Okay. There's one order on all post-trial motions. On post-trial—okay. Okay, sorry about that. Okay, well, thank you. Are you through? I believe that's all I've got, Your Honor. You need to stop when you're ahead. I will. Mr. Cooper, you have some time for— One thing Mr. Bonham has not addressed is the standard review. With respect to the apportionment issue, we filed a motion for new trial. Under the standard review, the trial judge is required to review all the evidence and see whether or not, after reviewing all the evidence, is it of sufficient weight to support the judgment or is it clearly against the great weight of the evidence. And when all the evidence supports the fact that there are other factors, then we— Other indefinite, unsupported factors. That's the problem again. Indefinite, unsupported factors. Well, again, we don't believe that there are indefinite, unsupported. For example— Maybe that's what he's— Mr. Bonham tries to say, well, he doesn't disagree that there were other factors to test about. His way of trying to avoid that testimony is, well, you didn't testify about each house. Well, if that were true, each particular buyer, in the Sheldon case, which had to do with the movie, there was not everybody who went to the movie. They didn't bring that testimony up there. In the Data General case, they didn't bring each customer who purchased their services up there. In the Danielson case, they didn't bring each person who purchased the condimenting up there to testify. It's not required. There is not a single case involving architectural copyright which requires, one, percentage allocation, two, that you have each buyer testify to it. It's just not there. Now, the jury—he says, well, the jury can choose. Well, if that were true, if that argument was right, and I don't want to repeat an argument, then in Danielson, Data General, Hablinski, we've cited all these cases. There was no reason to send those cases back for a new trial based upon a 0% apportionment. Well, you talk about differences in design relating to the bathrooms and the bedrooms. Well, your client could have testified that he had a certain kind of jacuzzi in the bathroom so that he had certain kind of high-end fixtures in the bathroom, so, you know, a Southeast Asian spa organization that was—did he testify so specifically? He did. He went through each of the plans. He testified about the differences that existed. For the 19 houses? For the 19 houses. We went through each plan. How many had pools? He testified—I know some of them did have pools and— And that's a lot of money. —design and things like that for those particular. But he did—you said that he did testify. We went through— Well, no, he did testify with respect to each house that had a pool. I mean, he did say that house— He testified as to each house of the 19 plans. Whether it had a pool or whether it had special features. I don't know about the pools. He did testify about the differences between the plans. He did talk about the finishes. He talked about the landscaping, the outdoor lighting, and things like that. I guess my point—was the case tried separately on liability and damages, or was it all just tried at once? It was all tried in one, and then the charge was, was there access for each house? Was there striking similarity in each house? And then the apportionment percentages for each house was the way that the case was submitted. One thing I do want to talk about, though, is the intertwined. Very quickly, the undisputed evidence with the plans were not inextricably intertwined with the profits. Mr. Bob said the design was the beginning of the process. The selection of the interior was not related to design. The supervision of the subs was not related to design. Purchase of materials was not related to design. Obtaining construction financing permits, not related to design. Marketing was not related to design. In the John Danielson case, if indeed the plans were inextricably intertwined with the design, again, the First Circuit could have said we're going not to send it back for a new trial based upon the 0% finding of attribution profits to factors other than the infringing copyright. Same thing for Penn Hollow. You know, that was an architectural plan. If his argument were true, if an architectural copyright case for construction of a building, if the plans were inextricably intertwined with the building of the structure, he would never have any apportionment. It would never happen. And so, again, one thing I'll... I don't agree with that. I would think that if you could... I mean, supposedly you did allocation for each house, right? And the jury, you said you did allocation of profits for each house? If you go to Joint Exhibit Number 1, you will see for each house, there is the revenue from each house. There is the hard costs that were attributable to each house. So, there was that for each particular house. Gross profit, in other words. The gross profit. The judge, the last thing I wanted to say was, Judge Werlein, if you read and you're referring to his... I'll get pretty quick now. He said, in all likelihood, the sole factor was not... One intuitively senses that Howlett's designs were in all likelihood not the sole factor that contributed to the defendants selling these homes for a profit. Okay. Thank you, Mr. Cooper.